Dear Dr. Shockley:
This office has received your request for an official Attorney General Opinion in which you ask, in effect, the following question:
 The Oklahoma Private Activity Bond Allocation Act, 62 O.S. 2001 Supp. 2007, §§ 695.21 — 695.26, ("Allocation Act"), provides for allocation of private activity bond issuance authority to state and local agencies. Who has authority and what actions are necessary to enable state and local agencies to issue additional housing bonds approved pursuant to the federal Housing and Economic Recovery Act of 2008, H.R. 3221 ("Housing Bill") which, among other things, increases for the year 2008, the private activity bond cap for each state as to housing bond issues?
Your question relates to the manner in which the State volume cap for private activity bonds[1] is determined and allocated, in the event federal legislation such as the Housing Bill, above, becomes effective after January 1 of a given year, and State law is silent on the matter. Is it possible for a state official to issue an order establishing the allocation without the need for Legislative action? To answer your question, a general explanation of the "volume cap" and processes by which such volume cap is allocated in Oklahoma is needed.
 INTRODUCTION
On July 30, 2008, the President signed into law the Housing and Economic Recovery Act of 2008 ("Housing Bill"), H.R. 3221, Pub.L. 110-289,122 Stat. 2654 (to be codified in scattered sections).[2] The Housing Bill, which, among other things in Section 3021, increased for calendar year 2008 only, the private activity bond volume cap for housing bonds in each state, according to a predetermined formula. Housing bonds are, in essence, bonds issued by a state or local governmental agency to provide financing for housing to assist persons of low to moderate income, elderly citizens, or persons in certain other enumerated categories. See26 U.S.C. §§ 42, 103, 141 — 150 (West, Westlaw through 2008). Such bonds are a kind of "private activity bond," that is, a bond the proceeds of which benefit a private person or entity. Id. § 141.[3] Other private activity bonds may be issued for such purposes as veterans' mortgages, student loans, and qualified redevelopments. Id. § 141(e). Each state has a "volume cap" or maximum amount of private activity bonds that may be issued by a state in a given year, essentially governed by multiplying a state's population by a per capita limit imposed by the Internal Revenue Code and accompanying regulations. See id. § 146.
The Code provides, in the absence of state statutes or regulations, that state agencies shall be authorized to issue 50 per cent of the state ceiling in a calendar year. Id. § 146(b)(1). But the Code further provides that "a State may, by law provide a different formula for allocating the State ceiling among the governmental units (or other authorities) in such State having authority to issue tax-exempt private activity bonds." Id. § 146(e)(1). Section 146(e)(2) provides that the Governor of any state has interim authority to proclaim a different formula for allocating the state ceiling, but this authority lapsed as of the earlier of "(i) the last day of the 1st calendar year after 1986 during which the legislature of the State met in regular session, or (ii) the effective date of any State legislation with respect to the allocation of the State ceiling." Since Oklahoma's Allocation Act, above, was enacted in 1990, (see 1990 Okla. Sess. Laws ch. 326, §§ 1 — 6), we conclude that under the above-cited Code provision, the authority of the Governor to proclaim a formula for allocating a volume cap among bond-issuing entities lapsed as of December 31, 1987 and thereafter, the allocation formula was prescribed by the Allocation Act.
As to housing bonds, the Housing Bill imposes, on a one-time basis for 2008, an increase in the state volume cap for private activity bonds for housing in each state, in proportion to the amount of a private activity bond cap assigned to that state. Housing Bill, § 3021(a). In Oklahoma, the formula will result in an increase of a volume cap for housing activities of approximately $118 million.[4] Since this increase is on a one-time basis, it is important for state and local agencies to know how much of the volume cap is allocated to each housing agency, and the process for allocation.
 VOLUME CAP ALLOCATION IN OKLAHOMA
In Oklahoma, the Oklahoma Private Activity Bond Allocation Act, 62 O.S. 2001 Supp. 2007, §§ 695.21 — 695.26 ("Allocation Act") governs to whom, in what amounts, and by what process, private activity bonds[5]
are allocated. For purposes of the Allocation Act, definitions, terms and provisions of the Code are adopted by reference. 62 O.S. 2001, § 695.26[62-695.26]. As previously discussed under the applicable Code provisions, we believe any authority of the Governor to proclaim a formula for allocating a volume cap in the State lapsed on the last day of 1987, leaving authority in the Legislature to proclaim the method of allocation. Without such allocation formula, the Code's rule of "50% to state agencies" in 26 U.S.C. § 146(b)(1) would apply, but since the Oklahoma Legislature enacted the Allocation Act in 1990 (see 1990 Okla. Sess. Laws ch. 326, §§ 1 — 6), we conclude the Legislature's method set out in the Allocation Act must prevail.
Section 695.24 of the Allocation Act contains provisions governing the amount of a volume cap to be allocated to various agencies or sectors. For instance, the Oklahoma Housing Finance Agency is allocated 15% of the cap, subject to certain restrictions. An amount equal to 17.5% of the cap is allocated to "Local Issuers" of single family mortgage revenue bonds, 12.5% is allocated to "Metropolitan Area" housing bond issuers, and 8% is allocated to "Rural Area" housing bond issuers. 62 O.S.Supp. 2007, § 695.24[62-695.24](F), (H), (I), (J). Another 4% of cap is allocated to a "State Issuer" pool, 12% is allocated to a "Qualified Small Issuer" pool, and 2.5% is allocated to an "Exempt Facility" pool.Id. § 695.24(C), (E), (G).[6] Under certain circumstances, part of the State Issuer, Qualified Small Issuer and Exempt Facility pools may be used for financing acquisition or construction of multifamily housing or residential rental facilities to be used in part to benefit persons of low income. 26 U.S.C. § 142(a)(7), (d). Section 695.25 of the Allocation Act provides, in pertinent part:
 A. On January 1 of each calendar year or the first business day thereafter, the State Bond Advisor shall determine the maximum total volume of private activity bonds that may be issued pursuant to federal law by the state during that year.
 B. On or before February 15 of each calendar year, the State Bond Advisor shall cause to be published in The Oklahoma Register, or any successor publication, a notice specifying the amount of the state ceiling for the calendar year.
 C. Allocations from the pools set forth in Section 695.24 of this title will be processed on the basis of the chronological order of receipt of completed applications for state ceiling allocation unless otherwise provided in said section. . . .
Id. Thus, Section 695.25 provides for the manner of publishing notice of the bond volume cap determination, and establishes a "first come, first served" mechanism for allocating cap among the respective agencies listed in Section 695.24. However, the Allocation Act makes no provision for a situation where the bond volume cap is increased by a federal law change after January 1. In the case of the Housing Bill, the pertinent part of the federal legislation did not become effective until July 30, 2008, when it was signed by the President. Housing Bill, § 3021(c). Under such circumstances, what means of determining and allocating the extra volume cap is legally appropriate?
This is an important question because if the State fails to allocate the extra volume cap before the end of 2008, State and local agencies will have lost the opportunity to issue many millions of dollars in bonds for use in offering financing assistance to qualifying low income homeowners or renters, or in refinancing distressed subprime mortgage loans.[7] By its terms, the Housing Bill only allows an increase in State volume cap for the year 2008. Housing Bill, § 3021(a)(1). While unused volume cap might be "carried forward" from 2008 to 2009 or 2010 (Housing Bill, § 3021(a)(2)), official action to authorize such private activity bonds must be taken in 2008, or else it is lost.[8]
We believe that power for the State Bond Advisor to determine when extra amounts of State volume cap become available because of a change in federal law, the amount of such volume cap, and how such amounts should be allocated, may be fairly implied from the express powers granted to the Bond Advisor in 62 O.S.Supp. 2007, § 695.25[62-695.25].
"[A]n officer or an agency may have implied powers not granted by statute. The authority will be implied if necessary for the due and efficient exercise of powers expressly granted or if it may be fairly implied from the statutory language." City of Hugo v. State ex rel. Pub.Employees Relations Bd., 886 P.2d 485, 492 (Okla. 1994); see Marley v.Cannon, 618 P.2d 401, 405 (Okla. 1980). "However, an agency created by statute may exercise only those powers granted and may not expand those powers by its own authority. In determining what authority may be implied from a statutory scheme, the statute as a whole is considered; and the legislative intent must be determined." City of Hugo, 886 P.2d at 492
(footnote omitted); see A. G. Opins. 07-7, at 40; 05-42 at 245.
In the present case, the Legislature, in enacting the Allocation Act, has plainly empowered the State Bond Advisor on each January 1 to "determine the maximum total volume of private activity bonds that may be issued pursuant to federal law by the state during that year." 62 O.S.Supp. 2007, § 695.25[62-695.25](A) (emphasis added). The power to determine the maximum total volume of private activity bonds and to allocate them has not been divided between the State Bond Advisor and the Governor, the Council of Bond Oversight, the Legislature, or any other State officer or agency. We think your question comes as a result of the Legislature not anticipating the present scenario in the Allocation Act, nor making express provision for the possibility the volume cap might be changed by an amendment in federal law later in the calendar year. But when the entire Allocation Act is read as a whole, the legislative intent to vest power in the State Bond Advisor to allocate bond volume capacity to the various state and local agencies is clear and unmistakable.
In an introductory paragraph of the Allocation Act, the Legislature provided:
 [T]he following formula and procedures are hereby adopted for the issuance of private activity bonds for the purpose of promoting employment, economic development, assuring the general health, safety and welfare of the citizens and residents of the state and otherwise lessening the burdens of government.
62 O.S. 2001, § 695.22[62-695.22]. Later in the Act, procedures are outlined for a process of "carrying forward" a portion of the state cap allocated to a qualified project to the next calendar year, when such amount has not been used by December 20. 62 O.S.Supp. 2007, § 695.25[62-695.25](K), (L).
Construing the Allocation Act as a whole, including the above-cited sections, we conclude it was the intent of the Legislature to take all reasonable measures to assure the state's private activity bond cap is either used in its entirety each year, or carried forward to the next year under conditions permitted by the Code. Otherwise, the outcome would be the loss of opportunity for agencies and bond issuers to utilize the full amount of state volume cap in a given year. We do not believe such an outcome, i.e., the loss of opportunity, can be imputed to the Legislature. See, e.g., McNeill v. City of Tulsa, 953 P.2d 329,332 (Okla. 1998).
In the present instance, assuming the Legislature does not resolve into a special session to clarify the Allocation Act, someone or someagency must determine how to allocate the extra volume cap for housing during calendar year 2008, or else the opportunity will be lost. We conclude the task of determining how the state volume cap is to be allocated among bond issuing entities must necessarily include the power to do so not only on January 1, but in the event of a law change, on any other date during the calendar year when the amount of such cap changes "pursuant to federal law." The power of the State Bond Advisor to accomplish this task must be necessarily implied under the above-cited authorities.
With respect to allocation of volume cap, it appears the intent of the Legislature was to make cap allocation a ministerial function of the State Bond Advisor. Section 695.22 of the Allocation Act states, "the following formula and procedures are hereby adopted for the issuance of private activity bonds," and subsequent sections of the act set out detailed definitions and a mathematical formula by which private activity bond issuance authority is to be allocated. Further, the Allocation Act, at Section 695.24(L), provides:
 L. The state ceiling for each calendar year shall be allocated within the categories set forth in subsections A, B, C, D, E, F, G, H, I and J of this section to all private activity bonds, as follows:1. Except as provided in Section 695.21 et seq.of this title, the state ceiling shall be allocated in the order in which confirmations are issued;
 2. The State Bond Advisor shall issue confirmations in the order in which fully and properly completed applications for state ceiling allocation are received. The State Bond Advisor shall have the limited authority to defer or deny confirmation on applications for state ceiling allocation which appear to be incomplete or premature based upon information submitted or which fail to show demand for funds pursuant to subsections F and G of Section 695.25 of this title; and
 3. The State Bond Advisor shall have no discretionary control regarding the issuance of confirmations, except as specifically provided in the Oklahoma Private Activity Bond Allocation Act.
 In the event a confirmation or application is denied, the State Bond Advisor, within five (5) business days following such denial, shall send written notice of such denial to the applicant together with a brief recital of the reason therefor.
Id. (emphasis added) (footnote omitted). Plainly, the Legislature intended that the State Bond Advisor should exercise little or no discretion in the allocation process. While the Bond Advisor determines the allocations to the various bond-issuing entities across the state and publishes the result, the process is essentially a mathematical one, whereby the Bond Advisor has "limited authority to defer or deny confirmation on applications." Id. 695.24(L)(2).
 REALLOCATION
To assure that the available amount of state volume cap is utilized, a "reallocation" process is mandated as of each September 2. "On September 2 of each calendar year, nonallocated sums remaining in the [various pools] shall be consolidated into the Consolidated Pool." Id.
§ 695.24(M)(1). Thereafter, all eligible local and state issuers are entitled to obtain allocations from this Consolidated Pool, based on the chronological order of completed applications received after January 1 of each calendar year which have not received an allocation. Id.
§ 695.24(M)(2). Finally, if any amounts allocated remain unused by an agency on December 20 of a given calendar year, the issuer may apply to the State Bond Advisor to "carry forward" a portion of the state ceiling into the next year, as permitted by the Code. Id. § 695.25(K). Penalties are imposed on state and local issuers that intentionally over-issue bonds or abuse the process. Id. § 695.25(N).
 EFFECT OF THE HOUSING BILL
Adoption of the Housing Bill in midyear adds a complication to the allocation of state volume cap, since the Allocation Act contains no provisions for such an event. In effect, an additional $118 million has been added to the volume cap, but such additional amount is earmarked exclusively for housing projects, and this additional cap amount became available at a time so as to make it practically impossible for issuers to utilize it prior to the reallocation period on September 2. Further, there has been no formal determination or announcement by the State Bond Advisor of the availability of the amount of additional cap, as would be required on January 1 for cap amounts under normal circumstances. See 62 O.S.Supp. 2007, § 695.25[62-695.25](A), (B). We believe the Bond Advisor must make this determination as soon as possible and announce the change in cap amount for calendar year 2008. Furthermore, because the change in cap amount will occur after the September 2, 2008 date, the Bond Advisor should increase the Consolidated Pool amount by the increased cap amount. These funds should be restricted to "Qualified Housing Issues" as provided under the Housing Bill. At that point, the allocation of the additional cap amount to qualified applicants can be on a "first come, first served" basis. As we understand the practice has been in the past,[9] if a number of applicants submit their applications at substantially the same time, some kind of blind, random drawing to select the order of making allocations may be appropriate, to assure fairness and remove any appearance of favoritism or impropriety.
 CONCLUSION
Therefore, we conclude that the State Bond Advisor, by inference from the Allocation Act, has the authority and duty to determine and announce the amount of additional housing bond volume cap available to potential issuers due to a change in federal law at any time during the year that such federal law becomes effective. Further, the Bond Advisor must utilize the same mathematical process mandated in Section 695.24 of the Allocation Act to dispense cap allocation to eligible applicants, based on a "first come, first served" basis. In other words, any additional volume cap that becomes available prior to September 1 must be allocated among categories of applicants in the same proportion set out in the Act. After September 1, a reallocation occurs through the Consolidated Pool, which is dispensed in the manner prescribed in Section 695.24(M) of the Act.
 It is, therefore, the official Opinion of the Attorney General that:
 Amounts of additional private activity bond cap in Oklahoma, as such terms are used in the Internal Revenue Code and associated regulations, that become available after January 1 of each calendar year as a result of a change in federal law, must be allocated by the State Bond Advisor utilizing the same process set out in the Private Activity Bond Allocation Act, 62 O.S. 2001 Supp. 2007, §§ 695.21 — 695.26. Amounts of additional volume cap for housing purposes established in the Federal Housing and Economic Recovery Act of 2008, H.R. 3221, Pub.L. 110-289, 122 Stat. 2654 (to be codified in scattered sections), must be determined and allocated by the State Bond Advisor, or after September 2, reallocated to the Consolidated Pool. Then these funds can be allocated to applicants for "Qualified Housing Issues" as provided under the Federal Housing and Economic Recovery Act of 2008 on a "first come, first served" basis under rules established in the Allocation Act. See 62 O.S. 2001 Supp. 2007, §§ 695.21 — 695.26.
W.A. DREW EDMONDSON
ATTORNEY GENERAL OF OKLAHOMA
DAVID L. KINNEY
ASSISTANT ATTORNEY GENERAL
[1] "Private activity bonds" are defined under both the Internal Revenue Code ("Code") and the Oklahoma Private Activity Bond Allocation Act ("Allocation Act") as discussed above. The Code is found at 26 U.S.C. §§ 1 — 9834.
[2] See Roger Runningen, Bush signs Measure for Homeowners, Fannie,Freddie (Update 2), July 30, 2008, http://www.bloomberg.com/apps/news?pid=20601087sid=am2yQYThqmxQrefer=h ome; Jeremy Pelofsky, Bush signs housing bill as Fannie Mae grows, July 30, 2008, http://www.reuters.com/article/newsOne/idUSN3042756820080730.
[3] Under 26 U.S.C. § 141(a), a private activity bond is a bond that meets the private business use test of Section § 141(b)(1) and the private security or payment test of Section 141(b)(2), or which meets the private loan financing test of Section 141(c).
[4] The precise figure for Oklahoma has not yet been determined. Telephone conversation between Assistant Attorney General Lynn C. Rogers and James Joseph, Oklahoma State Bond Advisor, July 29, 2008.
[5] Under the Allocation Act, private activity bonds are defined as "any bonds or notes or other evidence of indebtedness, the interest on which is exempt from tax pursuant to the Internal Revenue Code, and mortgage credit certificates, except those bonds or certificates specifically excluded from the state ceiling under the terms of federal legislation[.]" 62 O.S.Supp. 2007, § 695.23[62-695.23](19).
[6] Other pools are designated under Section 695.24 for Student Loans, Economic Development, and Beginning Agricultural Producers.
[7] Section 3021(b) of H.R. 3221 provides that proceeds may be used to refinance subprime mortgages. In light of the current financial turmoil, we believe issuers of Oklahoma Housing Bonds should move very cautiously in utilizing this provision.
[8] Section 3021(a)(1) of H.R. 3221 provides, "In the case of calendar year 2008, the State ceiling for each State shall be increased by an amount equal to $11,000,000,000 multiplied by a fraction. . . ."
[9] Under Administrative Rule OAC 90:15-1-3 of the Council of Bond Oversight, for purposes of determining "Chronological order" of applications, all completed applications received on or prior to "8:00 a.m. on the first business day of each year shall be recorded as having been received at the same time." Id. While this rule is only a guideline to the State Bond Advisor, it is our understanding that, for instance, if on September 2 there are a number of applications for cap allocation under the consolidated pool, it has been the practice of the Bond Advisor to treat such applications as having been received at the same time, and the Bond Advisor determines the order of consideration of such applications through a random drawing. We conclude this is a reasonable and appropriate method.